ALBERT ROBERTS, Respondent, v. CHARLES E. TAYLOR et al, Appellants.

(181 N. W. 622.)

**Navigable waters — "navigabiilty in fact" test as to whether inland lake is public water.**

1. In determining the status of an inland lake in this state, as public or private waters, the test of "navigability in fact" is applied.

**Navigable waters — "navigability in fact" defined.**

2. This test is not confined to a capacity for use in commerce of a pecuniary value, but may be extended to capacity for use for purposes of navigation for pleasure, public convenience, and enjoyment.

**Navigable waters — state possesses title to bed of public waters.**

3. The state, in its sovereign right, possesses the title to the bed of public waters within this state.

**Navigable waters — public land — state owns island within government school section.**

4. The state, in its proprietary right, owns an island existing in public waters located within a school section, which has been ceded by the Federal government to the state.

**Navigable waters — Sweetwater lake held navigable.**

5. Sweetwater lake, extending some 6 miles in length and in width 2 miles in places, with clear and deep water, meandered by the United States Govern-

NOTE.—The question as to what waters are navigable is discussed in a note in 42 L.R.A. 305.

On general tests by which the navigability of waters is determined in the United States, see notes in 126 Am. St. Rep. 717, and 131 Am. St. Rep. 757.

On the question as to what are navigable waters in the United States, see note in 22 L. ed. U. S. 391.

mental survey in 1883, and since that time used by the public for boating and hunting, and capable of being navigated for such and other purposes, is navigable.

**Navigable waters — riparian owners held to receive no title from Federal government to bed of navigable inland lake.**

6. The plaintiff and the defendant, riparian owners by virtue of grants from the Federal government and from the state to lands abutting upon such lake, received no title to the bed of the adjacent lake, and only the rights of riparian owners upon navigable waters.

**Navigable waters — state held interested in rights to bed of inland navigable lake—reliction must be considered in determining rights of riparian owners to bed of inland lake.**

7. The state, as well as the parties, are interested in the accessions that have occurred to the respective tracts of land through the recession of the lake waters, and the portion to be allotted to each is determinable upon principles of reliction.

Opinion filed January 4, 1921. Rehearing denied January 14, 1921.

Action in District Court, Ramsey County, *Kneeshaw, J.*, to determine adverse claims concerning the land of a lake bed.

The defendants have appealed from a judgment in favor of the plaintiff and demand a trial *de novo*.

Reversed and a new trial granted with directions to notify the state.

*Chas. A. & Chas. M. Pollock,* for appellants.

"The true test therefore, to be applied in such cases is, whether the stream is inherently and in its nature capable of being used for the purpose of commerce, for the floating of vessels, boats, rafts and logs." Moore v. Sanborn, 2 Mich. 520; Brown v. Chadbourne, 31 Me. 9; Lamprey v. State, 18 L.R.A. 678, 53 N. W. 1143.

Water must control riparian rights. Lamprey v. State, supra.

"The mere assertion of a claim unaccompanied by any act to give effect to it, cannot avail to keep alive a right which would otherwise be precluded." Mackall v. Casilear, 137 U. S. 556, 34 L. ed. 780.

*Flynn & Traynor* and *Edward Engerud,* for respondent.

"Water is navigable in law, although not tidal, where navigable in fact, and is navigable in fact where it is of sufficient capacity to be capable of being used for useful purposes of navigation, that is, for trade and travel in the usual and ordinary modes. This rule is not

only the one which prevails in nearly all of the states in this country but was also the rule under the civil law.  29 Cyc. 289.

"The stream must be navigable for some useful purpose, and as trade or agriculture, rather than for mere pleasure." Giddings v. Rogalewski (Mich.) 158 N. W. 951; 29 Cyc. 292.

"While the courts will take judicial notice of the navigability of all tide-water and particular rivers of the country on which navigation is conducted as a matter of common knowledge, the question whether or not a stream is navigable is ordinarily a question of fact, the burden of establishing which rests upon the party affirming it." Harrison v. Fite, 148 Fed. 781; 29 Cyc. 293.

"The burden of proof rests upon him who asserts the existence of the public servitude." Leihy v. Lumber Co. (Wis.) 5 N. W. 471.

The meander lines drawn by the Government surveyors were not the boundary lines of the fractional lots shown on the Government survey of section 36.

On this point the authorities are all agreed. Brignall v. Hannah, 34 N. D. 174; Producers Oil Co. v. Hanson, 238 U. S. 329; Harden v. Jordan, 140 U. S. 371, 35 L. ed. 428; Brignall v. Hannah, 34 N. D. 174.

The official surveys made by the Government are not open to collateral attack in an action at law between private parties.  90 N. W. 972; 197 U. S. 512, 49 L. ed. 860.

BRONSON, J. *Statement.* This is an action to determine adverse claims concerning land of a lake bed. The lands involved abut upon Sweetwater lake in Ramsey county and were meandered by the United States Governmental survey in 1883. The bed of this lake in controversy is located in section 36, a school section and contains upwards of 400 acres. Exhibit A, attached, is a rough plat of a portion of the lake. It shows the lands of the parties adjacent to the controverted lake bed, and also, roughly, a constructed fence, and the present shore lines of the North and South lake after recession of the waters. The plaintiff is the owner of lots 1 and 2 in section 36, comprising some 58 acres, upon title deraigned from the state of North Dakota; also, of lots 2, 3, 4 and 5 in section 31, adjoining, comprising about 56 acres, upon title deraigned from the United States. The defendant is the

owner of lots 3 and 4 in section 36, comprising about 17 acres, upon title deraigned, respectively, from the state of North Dakota and the

EXHIBIT A.

United States; also, of lots 1, 2, a portion of lot 3, and the S.E. $\frac{1}{4}$ of S.E.$\frac{1}{4}$ in section 35, comprising about 118 acres, upon title deraigned from the United States. The defendant is also the owner of 120 acres to the west of his lands above described. The plaintiff homesteaded

the land in section 31 in 1889 and 1890. He bought his lands in section 36 in 1901. The defendant became the owner of his lands in 1905. The plaintiff asserts in his complaint that he is the rightful owner of that half of the lake bed involved, adjacent to his land, to be determined by a line to be drawn equally distant between the meander lines of the ancient shore line. The defendant answers that he is the rightful owner of the lake bed involved adjacent to his land up to the fence designated in exhibit "A." That the lake was and is a navigable lake; that upon principles of reliction, through the gradual recession of the waters, he acquired such ownership up to the fence; that, furthermore, this fence has been constructed and maintained for a period of over thirty years, with the knowledge of the parties and the grantors; that the defendant has been adversely in possession of the lands claimed during the statutory period, and that, upon principles of estoppel applicable, with respect to the maintenance of the fence and the purchase of the lands, the plaintiff cannot dispute the title of the defendant thereto. The other defendants are claimant mortgagees.

Trial was had in August, 1919. The trial court found that the plaintiff was the owner of the bed of the lake as claimed by him. Pursuant thereto, judgment was entered. In a memorandum decision, the trial judge stated that he did not pass upon the questions of navigability of the lake nor the questions of estoppel in the record. The defendant has appealed from the judgment and demands a trial *de novo*. The additional facts necessary to be stated are substantially as follows:

Sweetwater lake is a large lake some 6 or more miles in length and some 2 miles in width at some places. It is fed from waters that proceed from arms of the lake and from a coulee to the northeast. The size of the lake has gradually changed during the past thirty-five years. In 1883, there existed one entire lake from the north to the south over section 36, excepting an island located towards the middle and the north of section 36. All the witnesses agree that this island, with timber and growing trees thereon, has always there existed since 1883. No witness testified that this island ever was inundated. Gradually, through the years, in the improvement and development of the country, a recession of the waters has occurred. The land in section 36, theretofore under water, became more and more dry land. There continued, however, in this section channels through which the waters

flowed from the north to the south. Most of the witnesses placed these channels more in the location where the fence was erected. A few witnesses testified that water flowed to the west of the fence from north to south. Gradually, a shore line was established, along the north side of section 36, and also along the south side of section 36. The witnesses have designated the lake to the south as the south lake or Storman lake and the lake to the north as Sweetwater lake. Some of the witnesses have stated that there were three lakes: Sweetwater lake to the north, Middle lake on section 36 south and west of the island, and the south lake. The trial judge, with the attorneys, visited the lake. The result of his inspection is made a part of this record. He entered section 36 from the east and went west upon plaintiff's land. He examined the lake to the north and east as far as the eye could reach. He stated that a few rods from the shore line the water was filled with growing weeds; that beyond those weeds there was one vast expanse of water stretching north and west, north and east; that the lake to the eastward was about 1 mile wide and looking to the west and north there was water as far as could be seen, all as more fully indicated by the government surveys thereof. The plaintiff testified that he knew this land since 1883; that then when the government survey was made water was running so that he could not get to the island from the east side and he was shut off likewise from the west side. He remembered once of wading across on the west side. That about that time there was a hunting lodge on the island; that he does not think he ever waded across then; that there was water at that time in a circle (around the east to the west) where the fence was; that gradually through the years the bed has become dry land; that he first saw this fence there as early as 1883 or 1884; that it has since remained there down to the present time.

One Lohnes, a veteran of the early days, having come up the Missouri as a soldier in 1867, testified he bought lots 1 and 2 in section 36 from the state and assigned his contract to the plaintiff; that at one time he was the owner of the defendant's land; that he and one Belgaard built this fence; that there was water along the entire length of it; that the water seemed to gradually dry up towards the fence; that he had also claimed the land west of the fence to be a part of the defendant's (then his) land; that he had an agreement with the plaintiff, when he made a bid concerning the school land later sold to the plain-

tiff, that this fence should be their dividing line. That when the fence was built there was water all through excepting what was called the island. He used this land for pasturing. Other witnesses gave testimony of hunting and boating on this lake and over this land during the years from the time of the survey. They hunted ducks in boats that were used on the north lake, thence to the land and around and upon the island. Another witness testified that, in 1883, the entire lake was one solid bed of water excepting the island; that this little island was always covered with timber ever since he could remember. That in early days one could not wade very far into the north lake until he got into deep water; that he has hunted over this land after ducks and saw long stretches of water from the northeast to the southeast upon this section 36. Many years ago the south lake became somewhat dry and later it filled up again. During the year when the trial was had this land involved in section 36 was planted into crops of flax, wheat, and barley, as to the greater portion thereof. In the patent from the state of North Dakota covering the land granted there appears the following: "Reserving and excepting from the portion of this grant all rights and privileges vested in the state of North Dakota under the provisions of the Constitution and laws of said state." Upon this appeal the defendant contends that the lake is navigable; that, as a riparian owner, the defendant is entitled upon principles of reliction to the land involved adjacent to his land up to the fence; that he established, furthermore, title by adverse possession, laches, and estoppel.

The plaintiff contends that the lake is non-navigable; that the adjacent riparian owners each take to the center of the lake in section 36 upon the method of determination stated in his pleading and as found by the trial court. That the existence of the island may be disregarded for the reason that it was not shown in the governmental survey and that such survey cannot be collaterally attacked.

*Decision.*—It is essential to first determine whether the waters of the lake involved are to be deemed public or private waters. This is for determination by this state in accordance with its policy and law. Brignall v. Hannah, 34 N. D. 174, 184, 157 N. W. 1042; St. Anthony Falls Water Power Co. v. St. Paul Waters Comrs. 168 U. S. 349, 42 L. ed. 497, 18 Sup. Ct. Rep. 157; 1 Lewis, Em. Dom. 3d ed. § 92; Lamprey v. State, 52 Minn. 181, 18 L.R.A. 670, 38 Am. St. Rep. 541,

53 N. W. 739. In making such determination the test of navigability is applied.

It may not be doubted that in this state such test is a test of navigability in fact borrowed from both civil-law and common-law principles in contradistinction to the so-termed "tidal test" of the common law. See 1 Farnham, Waters, § 23; 1 Lewis, Em. Dom. 3d ed. § 91; Bissell v. Olson, 26 N. D. 60, 66, 143 N. W. 340; Justinian Inst. bk. 2, title 1. Ware, Roman Water Law, §§ 41, 74, 76; Palmer v. Mulligan, 3 Caines, 307, 2 Am. Dec. 270. There are no tidal waters within this state. Assuredly, therefore, if any public waters there are they must so exist upon such test or pursuant to direct declaration of the law. In the Constitution of this state it is stated. "All flowing streams and natural watercourses shall forever remain the property of the state for mining, irrigation, and manufacturing purposes." N. D. Const. § 210. This is a declaration concerning public waters. See Bigelow v. Draper, 6 N. D. 152, 162, 163, 69 N. W. 570. The statutes have given recognition to this constitutional policy. Section 5352, Comp. Laws 1913, prescribes "except when the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on a navigable lake or stream, takes to the edge of the lake or stream at low-water mark, and all navigable rivers shall remain and be deemed public highways." Section 5475, Comp. Laws 1913, provides: "Islands and accumulations of land formed in the beds of streams which are navigable, belong to the state, if there is no title or prescription to the contrary." These disclose affirmatively a declaration of ownership in the beds of navigable waters. In the instant case there are two prime questions involved: The character of the waters and the ownership of the bed involved. In this case, the contest is not between a riparian owner and one seeking to assert the right of navigation as a public right upon the lake or to establish an asserted use as a public use for which the lake waters show a capacity therefor. The question here involved is presented between parties both seeking to exclude any public use or public right in the open waters or the lake bed of the section involved, and to fix the status thereof as wholly private. In this regard, in this state, a lake is differentiated from a watercourse only in that it is simply an enlarged watercourse wherein the waters may flow or a basin wherein the waters are quiescent.

The plaintiff would confine the application of the test of "navigability in fact," to waters that are capable of some commerce of pecuniary value as distinguished from boating or for pleasure, and would impose upon the defendant the burden of establishing such capacity in fact for public use. The public status of waters and of their beds in this state are not to be determined as between parties in this case by the test of use for commerce of a pecuniary value and by proof of a then existing use for such purpose in order that the public status may be preserved and the state title to the bed retained. A public use may not be confined entirely within a use for trade purposes alone. A use, public in its character, may exist when the waters may be used for the convenience and enjoyment of the public, whether traveling upon trade purposes or pleasure purposes. There is a growing recognition that the utilities of nature, so far as public use are concerned, are not always to be measured by the sign of the dollar. Purposes of pleasure, public convenience, and enjoyment may be public as well as purposes of trade. Navigation may as surely exist in the former as in the latter. See Lamprey v. State, supra; Flisrand v. Madson, 35 S. D. 457, 465, 152 N. W. 796; West Roxbury v. Stoddard, 7 Allen, 158, 171; notes in 126 Am. St. Rep. 718, 131 Am. St. Rep. 758; and 42 L.R.A. 316; 1 Lewis, Em. Dom. 3d ed. § 91.

The proof of the status is rather a proof of capacity than one of then existent use. If the waters involved are capable of a proper public use in the environment where situated and to which they are or may be made subservient, it is sufficient. See Bissell v. Olson, 26 N. D. 60, 67, 143 N. W. 340; Moore v. Sanborne, 2 Mich. 519, 59 Am. Dec. 209; 1 Farnham, Waters, § 26; 1 Lewis, Em. Dom. 3d ed. § 91. It is therefore apparent that, pursuant to constitutional and statutory provisions and state policy, the title of the bed of the lake involved, if deemed public waters, was and is in the state of North Dakota, whether considered in its jus publicum or jus privatum. Were and are the waters of Sweetwater lake to be deemed public waters? In 1883, it was a large lake; it is now a large lake; it has a vast expanse of water extending many miles to the north and south and extensive in width. It is not a pond nor a marsh; it has both clear and apparently deep water extending for miles; it has been used for hunting and for boating by the public. There is no showing in the

record that this is a shallow lake or properly to be used only for private purposes. The meandered governmental survey demonstrates the lake to be a large permanent body of water. It is supplied with water from tributaries that extend to the north and to the east. For over thirty-five years this lake has existed except as, in the improvement of the country, recession has occurred in its shore lines. The trial court has observed there are no weeds except on the shore line and as he viewed the water there was one vast expanse thereof stretching to the north and the west, as far as the eye could reach, and as indicated by the governmental survey. Assuredly this record admits of the finding that such waters have capacity for public use. They are therefore to be deemed upon this record public waters navigable in character.

In 1883 the land of the parties and the bed of the lake were then the property of the United States. Then the land adjacent to the lake was surveyed by our Federal government. The surveyors meandered the surveyed land describing its course and amounts, pursuant to Federal methods of survey, along this lake. The lake was then navigable. By inadvertence, apparently, the surveyors did not note the island then existing. It then was timbered. It must have been of considerable extent. Upon plaintiff's maps submitted it comprises many acres. When this state was admitted into the Union, the title and ownership to all of section 36, both that of the island and of the bed of the lake, passed to the state, both as school land and by reason of state sovereignty. Enabling Act, § 10. See Donnelly v. United States, 228 U. S. 243, 262, 57 L. ed. 820, 828, 33 Sup. Ct. Rep. 449, Ann. Cas. 1913E, 710. The plaintiff's rights as riparian owner are based upon his title received from the state to lots 1 and 2 in section 36. The defendant's rights are likewise so based, concerning lots 3 and 4 in block 36; otherwise, as to the remaining riparian land, upon title received from the Federal government. The grant made by the state to the parties did not convey to them the island nor any part of the bed of the lake. The state expressly reserved its rights under the Constitutional laws of this state. The parties secured such rights as they were entitled to have as riparian owners upon public waters: The patent from the Federal government to the defendant likewise conveyed no title to the island nor to the bed of such navigable waters.

He secured with such patent likewise only his riparian rights. Manifestly the island, ever since its acquisition, has been and is the property of the state. Sec § 5475, Comp. Laws 1913; Flisrand v. Madson, 35 S. D. 457, 471, 152 N. W. 796. There remains therefore for consideration the rights of the parties as riparian owners upon land, formerly the bed of navigable waters, which has been freed from its public status and has become land in fact. As riparian owners, the parties were entitled to receive these additions, the alluvion so termed, to riparian land which accumulates through processes of accretion or reliction. Such additions become a part of the original tract. Comp. Laws 1913, § 5473; Heald v. Yumisko, 7 N. D. 422, 427, 75 N. W. 807; Brignall v. Hannah, 34 N. D. 174, 185, 157 N. W. 1042; Flisrand v. Madson, 35 S. D. 457, 464, 152 N. W. 796. Likewise, upon the same principles, the state, as owner of the island and a riparian owner, was entitled to the accession properly accruing to the island. The state is not a party to this action. It is necessary that it be a party or that its rights be considered in order to determine the relative proportions as well as the facts concerning the land properly to be apportioned to each upon principles of reliction. The facts necessary for such determination are not presented in this record except in a general way. It is quite proper that an opportunity be given for particular proof in this regard. It is evident upon the determination as made in this opinion that the contentions concerning adverse possession, laches, and estoppel are without merit.

It is ordered that the judgment be reversed, and a new trial granted, and that the Attorney General of this state be notified so that the state may become a party or otherwise protect its interests as it may desire or deem expedient.

ROBINSON, GRACE, and BIRDZELL, JJ., concur.

CHRISTIANSON, Ch. J. (concurring specially). I agree with what is said in the opinion prepared by Mr. Justice Bronson to the effect that the "test of navigability" is capacity of use for navigation rather than actual use for such purpose. (Of course, where the surrounding country is settled, the fact that a body of water has not been so used may be a circumstance to be considered with other evidence to determine

whether the body of water is in fact navigable.) I also agree that the state, in its sovereign right, possesses title to the beds of public waters in this state; also that as a general rule islands formed in such waters, belong to the state.

From the evidence submitted in this case, I am rather inclined to the belief that the lake in question is a navigable one. However, in view of a new trial, I believe that that question should be left open so that the parties might introduce such additional evidence bearing on this question as they might desire to offer. I also agree that the evidence adduced discloses a condition of facts with reference to the island which makes it necessary that the state be made a party to the litigation; but I am not prepared to say that the island unquestionably belongs to the state. The question of its ownership should be determined only after the contending parties (as well as the state) have had an opportunity to introduce evidence and present arguments bearing on this question.