[File No. 6457.]

CARL OBERLY, Respondent, v. JESSE R. CARPENTER and
Henry Plath, Appellants.

(274 N. W. 509.)

Opinion filed June 23, 1937. Rehearing denied July 22, 1937.

*Charles L. Crum,* for appellants.
*Geo. F. Shafer,* for respondent.

NUESSLE, J. This is a statutory action to determine adverse claims to certain bottom lands lying along the Missouri river. Trial was had to the court without a jury and judgment was entered for the plaintiff. The defendants appeal.

The record discloses that the plaintiff is the owner of the "Northeast Quarter of the Southwest Quarter and the Lots Two, Three and Four of Section 24, and the Lot Seven of Section 23 in Township 137, Range 80, containing one hundred sixty-five and ten hundredths acres, according to the Official Plat . . ." through conveyances from the patentee of the federal government. The patent is dated May 27, 1918. The defendant Carpenter claims as the entryman under a homestead entry made September 15, 1933, for lots 4 of section 26 and lots 2, 3 and 4 of section 25, township 137, range 80, and the defendant Plath claims as the entryman under homestead entry made September 11, 1933, for lot 1 of Section 24 and lot 1 and the South half of the northeast quarter of section 25 in the same township. This township was surveyed in February, 1899. The map of the township conformable to the field notes of the survey thereof duly examined and approved and filed in the Surveyor General's office, shows that at the time of said survey the Missouri River traversed the township, running first in a southerly direction through the West half of section 23, thence southeasterly through sections 23 and 26, thence easterly and finally northeasterly through sections 24 and 25. No parts of sections 25 and 26 lay north or east of the river. On the east side of section 24 where it then crossed the township line, the river was

148.6 rods wide and at no point of its course through the township was it less than 80 rods in width. Lot 7 of section 23, and lots 2, 3 and 4 of section 24 of the plaintiff's land were bounded on the south by the river. The meander lines on the south of these lots coincided with the river bank. Lots 2 and 7 were contiguous, lot 2 being east, and 7, west of the section line. The section corner at the southwest corner of section 24 and the southeast corner of section 23 was exactly on the north bank of the river and at no other point in said sections 23 and 24 did the said lots or any of them touch the extended section line between sections 24 and 25 and sections 23 and 26. This section line was not run except on the south side of the river between lot 1 of section 24 and lot 1 of section 25, and between lot 5 of section 23 and lot 2 of section 26. Lot 1 of section 24, the only part of that section south of the river, was triangular in shape. The east side along the section and township line measured 306.9 feet. The south side along the section line between sections 24 and 25 measured 1042.8 feet. The meander line along the river bank on the northwest formed the hypotenuse of the triangle. This lot contained only 3.67 acres. Lot 4 of section 26 and lots 2, 3 and 4 of section 25, (the descriptions included in the defendant Carpenter's entry) were bounded on the north and the northwest by the river, and the meander lines constituting the north lines of said lots coincided with the south bank of the river. Lot 2 of Carpenter's entry lay directly west of lot 1 of section 25 of defendant Plath's entry. The Missouri River at the time of the survey marked and at the present time marks the dividing line between Burleigh and Morton Counties, Burleigh lying north and Morton south of the river at this point. In September, 1933, at the time the defendants made their entries above described, the river had changed its course from that which it followed at the time of the survey in 1899 so that in 1933 the north bank of the river where it crossed the township line out of township 137, range 80, was some 240 rods south of the point where it had been in 1899, and about 85 or 90 rods south of the point where the south bank of the river had been in 1899. And on the section line between Sections 25 and 26 the north bank of the river, which in 1899 at the time of the survey was exactly at the section corner, had moved south some 126 rods so

that at the time of the trial it intersected the section line at approximately the point where the south bank of the river had intersected said line at the time of the survey in 1899. The whole north bank of the river, intermediate the points where it had intersected the west line of section 25 and the east line of the township had moved south correspondingly, so that the bank now follows a fairly symmetrical curve from the west line of said section to the east line.

The present controversy between the plaintiff and the defendants is as to the ownership and right of possession of the tract which now lies between the meander lines on the south sides of the plaintiff's lots as laid out in the government survey of 1899 coincident with the north bank of the river as it then ran, and the north bank of the river as it ran in September 1933, and at the time of the trial. The plaintiff claims this tract as an accretion to his lots. The defendants deny this claim and assert right of possession and ownership thereof by virtue of their respective homestead entries.

The only real dispute between the parties as to any matter of fact is with respect to whether the change in the course of the river from that which it followed in 1899 was slow and by imperceptible degrees due to accretions on its north bank and the gradual recession to the south of its waters, or was sudden and perceptible due to the formation of ice gorges and the consequent cutting of wholly new channels. Numerous witnesses were called by the respective parties to sustain their contentions in this regard. The trial court, among other things, found that "since the year 1899 the channel of the Missouri River on the south side of said (plaintiff's) lots has gradually shifted in a southerly and southeasterly direction and the waters of said Missouri River have by gradual and imperceptible degrees receded southward and southeasterly from the course over which the same flowed at the time the said government survey thereof was made; that as a result of said gradual recession and shifting of the stream of the Missouri River, there has since the year 1899 formed upon the north bank of the Missouri River adjacent to said above described lots, new lands by accretion from natural causes and by imperceptible degrees and not by avulsion; that the new land so formed upon the north bank of the Missouri River at said location is now and has been at all times

since its formation contiguous to said above described lots; that said new land is located in Burleigh county, North Dakota. . . ." After a careful examination of the record we hold that the above finding of the trial court is well sustained by the evidence.

Regardless of their disagreement as to other matters, there is no dispute among the witnesses as to the fact that at the time of the survey the north bank of the river was as shown by such survey. Neither is there any substantial disagreement with respect to the character and condition of the tract in dispute between the old bank of the river and the bank as the same runs at this time. This tract is now overgrown with trees and brush. The trees are mostly cottonwood, though there are some ash and box elder. The brush is diamond willow and other willows such as commonly grow on the lowlands of the Missouri river. The largest trees are growing on that part of the tract which was occupied by the bed of the river in 1899 and the trees and brush become gradually smaller from there on south to the present course of the stream. That portion of the tract nearest the present river bank is grown up with small and young willow brush and the plat made by the witness Atkinson from a survey in 1934 shows there is now a broad belt of sand bars and mud flats between the bank and the thread of the stream. The whole of this tract in dispute is rough and humpy. There are sandy knolls and ridges, and depressions which after heavy rains or raises in the river are filled with water. There are numerous courses or channels where at some time or other water has run. Some of the tract shows a relatively good soil but the greater part of it is sandy. The better soil is near to the old bank. The sandier portions are nearer the present bank, and the closer they lie to the river the sandier they are. Some of the cottonwood trees are of considerable size. The defendant Carpenter testified that one in particular is some three feet in diameter, and certain of the other witnesses testified to the same effect. This particular tree is some twenty rods north of the Carpenter house. The record is uncertain as to where this house is located, but apparently it and the large tree, concerning which he testified, are where the river ran in 1899. It appears that during the spring floods great ice gorges some times form on this section of the river. There were such in 1910, 1913, 1917 and 1929, and lesser ones at other times. Sometimes when such gorges

form the river cuts a new channel, but that happens very infrequently, and there is no evidence that it has occurred along this particular section since 1899. Rather, the testimony is to the contrary. It appears that the main channel of the river is along the south bank and this is to be expected as the river flows from the northwest, impinges against the south bank, and turns again northeasterly. The consequence is that the south bank is being eaten away and alluvion deposited on the opposite bank. The testimony is that the river has retreated to the south continuously since 1899 from a few yards to several hundred yards annually and this change has come about through a process of cutting on the south side and depositing on the north. On the record we can come to no other conclusion than that at which the trial court arrived.

The statute, § 5352, Comp. Laws 1913, provides with respect to boundaries of land: "Except when the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on a navigable lake or stream, takes to the edge of the lake or stream at low water mark, and all navigable rivers shall remain and be deemed public highways. . . ."

And with respect to riparian accretions, the statute, § 5473, Comp. Laws 1913, reads: "When from natural causes land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank."

This court has heretofore had occasion to consider the foregoing provisions and also the statutes of the United States prescribing the rules for ascertaining the boundaries of public lands that have been surveyed and granted by the federal government. See Heald v. Yumisko, 7 N. D. 422, 75 N. W. 806; Brignall v. Hannah, 34 N. D. 174, 157 N. W. 1042; Roberts v. Taylor, 47 N. D. 146, 181 N. W. 622; Gardner v. Green, ante, 268, 271 N. W. 775. In Gardner v. Green, the federal statutes applicable are set out and many cases construing and applying the same are cited and discussed.

In the instant case it clearly appears that at the time of the survey in 1899 the Missouri river bounded the deeded lands now owned by the plaintiff on the south. The fractional subdivisions were mean-

dered. The meander lines were coincident with the north bank of the river. When the patent was issued in 1918, the tract therein conveyed was described as the "Northeast Quarter of the Southwest Quarter and the Lots Two, Three and Four, of Section Twenty-four, and the Lot Seven of Section Twenty-three . . . containing One Hundred and sixty-five and ten hundredths acres, according to the Official Plat of the Survey of the said land, returned to the General Land Office by the Surveyor General." There are no reservations contained therein material to the matters here in issue. There is nothing to indicate that there was any intent to reserve the land, if any there was, between the meander line and the water line. The evidence is that in fact the two lines coincided. Nevertheless, the appellant insists that under the terms of this grant there is a clear limitation as to the quantity of the land thereby conveyed and therefore the grantee took nothing beyond the meander line. We think that this is not the case. In Heald v. Yumisko, 7 N. D. 422, 75 N. W. 806, supra, we held that "When an irregular tract or lot of land abuts upon a stream of water, and a meander line is run ostensibly along this shore line for the purpose of fixing the area of such tract, the real boundary of the tract is the shore line, and not the meander line." In Brignall v. Hannah, 34 N. D. 174, 157 N. W. 1042, supra, we held that "As a general rule the meander lines run along the margin of non-navigable lakes or ponds, are not intended as boundary lines, but are run for the purpose of determining the quantity of land for which the purchaser must pay." And in Gardner v. Green, ante,. 268, 271 N. W. 775, supra, we held the true boundary of public lands conveyed by patent of the United States is the water line and not the meander line. These holdings are in accord with the practically unanimous voice of the authorities. See authorities cited in Gardner v. Green, ante, 268, 271 N. W. 775, supra. See also Hardin v. Jordan, 140 U. S. 371, 35 L. ed. 428, 11 S. Ct. 808, 838; 9 C. J. 189, et seq.; 4 R. C. L. 88, and cases cited.

The fact that the survey was made in 1899 and the patent was not issued until 1918 and in the meantime the river had retreated far from the shore line as it existed at the time of the survey, makes no difference. "The patent passes the title of the United States to the

land, not only as it was at the time of the survey, but as it is at the date of the patent, so that the United States does not retain any interest in any accretion formed between the survey and the date of the patent." Jefferis v. East Omaha Land Co. 134 U. S. 178, 33 L. ed. 872, 10 S. Ct. 518.

When the land now owned by the plaintiff belonged to the United States the title was subject to the laws of the state the same as though it were the property of a private owner. Wiltse v. Bolton (Neb.) 272 N. W. 197, and authorities cited. And when it was granted by the United States the rights of the grantee were determined by the law of the state of North Dakota. Brignall v. Hannah, 34 N. D. 174, 157 N. W. 1042, supra; Hardin v. Jordan, 140 U. S. 371, 35 L. ed. 428, 11 S. Ct. 808, 838, supra; Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, 18 L.R.A. 670, 38 Am. St. Rep. 541; 9 C. J. 181, and cases cited. The statute, section 5473, supra, provides that alluvion belongs to the owner of the bank along which it is formed. And this is the general rule. See 9 C. J. 195; 1 R. C. L. 228. Accordingly, the vital and determinative question of fact in the instant case is as to whether the tract of land out of which this controversy arises was formed gradually and by imperceptible degrees or whether it was the result of a sudden and violent change in the course of the river. We have heretofore determined that the record in this case amply sustains the trial court's finding that "this tract was formed by accretion from natural causes and by imperceptible degrees and not by avulsion." It is. true there is testimony to the effect that when the river was in flood the rate of cutting where the current struck the bank was relatively rapid and that at times when this was taking place portions of the bank might be seen, when undermined, to fall into the river. But it also appears that the material thus taken by the river was dissolved and washed away and was not at any later time susceptible of identification. And, on the other hand, the new land which was formed was formed slowly and imperceptibly, that is, its formation could not be seen at any particular moment and could only be noted after the lapse of some time. (See the description of this process in Nebraska v. Iowa, 143 U. S. 359, 36 L. ed. 186, 12 S. Ct. 396, which exactly fits the facts in the instant case.) Accordingly, the process

that thus went on constituted accretion and the new land thereby formed was alluvion. Roberts v. Taylor, 47 N. D. 146, 181 N. W. 622, supra; Jefferis v. East Omaha Land Co. 134 U. S. 178, 33 L. ed. 872, 10 S. Ct. 518, supra. So, under the statute, § 5473, it belongs to the plaintiff as the owner of the bank along which it was thus formed. Roberts v. Taylor, supra.

The defendants further insist that, in any event, the new land thus added to the plaintiff's land and to which plaintiff claims title under section 5473, cannot extend beyond the section line between section 24 and 25 and section 23 and 26. The first answer to this contention is that at the time of the survey this section line was not run north of the river. The second and conclusive answer is that the law governing riparian rights has no regard for artificial boundary lines, whether between sections or their subdivisions, or between counties, states or nations. See the illuminating opinion of Mr. Justice Brewer in Nebraska v. Iowa, 143 U. S. 359, 36 L. ed. 186, 12 S. Ct. 396, supra. See also Widdecombe v. Chiles, 173 Mo. 195, 73 S. W. 444, 61 L.R.A. 309, 96 Am. St. Rep. 507; Yearsley v. Gipple, 104 Neb. 88, 175 N. W. 641, 8 A.L.R. 636; Doebbeling v. Hall, 310 Mo. 204, 274 S. W. 1049, 41 A.L.R. 382. The controlling rule as it applies in the instant case may be stated thus: "Where a water line is the boundary of a given lot, that line, no matter how it shifts, remains the boundary, and a deed describing the lot by number or name conveys the land up to such shifting line exactly as it does up to a fixed side line and conveys all accretion thereto." Jefferis v. East Omaha Land Co. 134 U. S. 178, 33 L. ed. 872, 10 S. Ct. 518, supra.

The judgment of the district court must be and it is affirmed.

CHRISTIANSON, Ch. J., and BURR, and MORRIS, JJ., concur.