In the Matter of the OWNERSHIP OF the BED OF DEVILS LAKE.

Appeal of STATE of North Dakota and the Garrison Diversion Conservancy District.

Civ. No. 870144.

Supreme Court of North Dakota.

April 18, 1988.

Murray G. Sagsveen (argued), Sp. Asst. Atty. Gen., & Michael G. Fiergola (argued), Sp. Asst. Atty. Gen., Bismarck, for appellants State of North Dakota & Garrison Diversion Conservancy Dist.

Traynor, Rutten & Traynor, Devils Lake, for appellee Group of Landowners; argued by Thomas E. Rutten.

Gerald R. Keating (argued), Minneapolis, Minn., for appellee Davis Family.

Sarah P. Robinson (argued), Land & Natural Resources Division, U.S. Dept. of Justice, Washington, D.C., amicus curiae.

Foughty, Christianson & White Eagle, Devils Lake, for appellees George W. & Diane Cox, Harley C. & Alice Raumin. No appearance.

GIERKE, Justice.

The State of North Dakota and the Garrison Diversion Conservancy District (hereinafter collectively referred to as the State) appealed from a district court judgment in a class action concerning ownership of the bed of Devils Lake below the meander line. We affirm.

After remand in *Park District of the City of Devils Lake v. Garcia,* 334 N.W.2d 824 (N.D.1983), several quiet title actions were consolidated and the case was certified as a class action to quiet title to the bed of Devils Lake below the meander line around Devils Lake in certain designated townships. The membership of the class was denominated as "All landowners

above, but adjacent to, the meander line around Devils Lake and all landowners who claim an interest in the lakebed below the meander line." The United States of America, the Devils Lake Sioux Tribe, the plaintiffs in *101 Ranch v. United States* [Civil No. A2–81–89 (D.N.D.)], the State of North Dakota, and the Garrison Diversion Conservancy District were excluded from the class. The court's order provided that the following issues would be considered:

"a. Whether Devils Lake was navigable-in-fact at the time of statehood.

"b. Whether the ordinary high water mark for Devils Lake was (at the time of statehood), and continues to be, the meander line or whether the ordinary high water mark is ambulatory (i.e., moves with the fluctuating elevation of the lake). If ambulatory, where is the ordinary high water mark at this time?

"c. Whether any member of the class own, or have an interest in, lakebed below the meander line. If the members of the class have an interest in the lakebed, what is the nature of the interest?"

The trial court found that: (1) Devils Lake was navigable at statehood; (2) the meander line is an "extremely poor and inaccurate approximation of the ordinary high water mark" at statehood; (3) expert opinions "indicate that the ordinary high water mark of Devils Lake at statehood was approximately 1,426 feet above mean sea level;" (4) physical evidence indicates that the ordinary high water mark gradually and imperceptibly receded until approximately 1940 and has since then gradually and imperceptibly risen; and (5) "physical evidence indicates that the ordinary high water mark of Devils Lake is presently located once again at an elevation of approximately 1,426 feet above mean sea level."

A partial judgment was entered that provides, in part:

"I

"Upon being admitted to statehood the State of North Dakota acquired the bed of Devils Lake, the boundary of which was the ordinary high water mark.

"II

"From statehood until approximately 1940, the level of Devils Lake gradually and imperceptibly receded, and new ordinary high water marks were from time to time established at lower elevations. As new ordinary high water marks were established, the bed of Devils Lake diminished in size, and therefore so did the area owned and controlled by the State of North Dakota.

"III

"By legislative act now codified as section 47–01–15 of the North Dakota Century Code, the State of North Dakota granted to riparian and littoral landowners ownership rights below the ordinary high water mark, down to the low water mark; the full extent and nature of those rights as balanced against public rights, if any, extending up to the ordinary high water mark, has yet to be determined in this state and is not at issue in this lawsuit.

"IV

"At any given time the area comprising the bed of Devils Lake which is owned and controlled by the State of North Dakota and its grantees is bounded and defined by the ordinary high water mark as it exists at that time, save and except for the effect of section 47–01–15, NDCC, to the extent that said section grants riparian and littoral owners rights down to the low water mark as it exists at that time."

The trial court issued a Rule 54(b), N.D.R. Civ.P., certification to allow an immediate appeal.

■ The State contends that it took title to the bed of Devils Lake at statehood to the ordinary high water mark as represented by the meander line established by governmental surveys and that it retains title to all land up to the meander line despite recession of the waters of Devils Lake. The private landowners, on the other hand,

contend that they own the land exposed by the recession of the waters of Devils Lake under the doctrine of reliction,[1] which gives them title to the current ordinary high water mark.

Although the State has raised a number of issues on appeal, we deem it necessary to address only its contention that the meander line was the ordinary high water mark of Devils Lake at statehood and remains so today because the doctrine of reliction is inapplicable to Devils Lake. The other issues relate either to findings of fact that are not clearly erroneous or to matters not decided by the trial court and therefore not ripe for review.

■ Initially, we note that a water line, rather than a meander line, ordinarily forms the boundary of a tract of land abutting a navigable body of water. *See, e.g., Ozark–Mahoning Co. v. State,* 76 N.D. 464, 37 N.W.2d 488 (1949); *State v. Brace,* 76 N.D. 314, 36 N.W.2d 330 (1949); *Oberly v. Carpenter,* 67 N.D. 495, 274 N.W. 509 (1937); *Gardner v. Green,* 67 N.D. 268, 271 N.W. 775 (1937); *Brignall v. Hannah,* 34 N.D. 174, 157 N.W. 1042 (1916); *Heald v. Yumisko,* 7 N.D. 422, 75 N.W. 806 (1898); R. Beck, *Boundary Litigation and Legislation in North Dakota,* 41 N.D.L.Rev. 424 (1965); H. Ruemmele, *Origin of Surveys in North Dakota,* 24 Bar Briefs 102 (1948).

The State observed in its brief that "[t]he trial court, in its conclusions, adopts an 'ambulatory' OHWM[2] for Devils Lake and applies the doctrine of reliction so that the OHWM follows the fluctuating elevation of Devils Lake." Relying on *Oregon v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977); *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); and § 61–15–01, N.D.C.C., the State argues:

"This novel concept is contrary to the decisions of the Supreme Court that 'state title is not subject to defeasance,' 'that the title thus acquired by the State is absolute so far as any federal principle of land titles is concerned' (i.e., that 'federal common law' does not apply), that 'conveyance by the United States of land riparian to a *navigable* river carries no interest in the riverbed,' and that the OHWM is not the same as the low water mark." (Footnotes omitted.)

The concept of an ambulatory ordinary high water mark forming the boundary of land along a navigable body of water as an incident of the doctrine of reliction is not contrary to the cited decisions of the United States Supreme Court. Insofar as they are relevant to the issues involved here, those decisions recognized that a state's title to land underlying a navigable body of water "vests absolutely as of the time of its admission and is not subject to later defeasance by operation of any doctrine of federal common law" (*Corvallis, supra,* 429 U.S. at 371–372, 97 S.Ct. at 587, 50 L.Ed.2d at 558); that such title is "absolute so far as any federal principle of land titles is concerned" (*Corvallis, supra,* 429 U.S. at 375, 97 S.Ct. at 589, 50 L.Ed.2d at 560); that "[t]he title and rights of riparian or littoral proprietors in the soil below [the] high-water mark, therefore, are governed by the laws of the several states" [*Corvallis, supra,* 429 U.S. at 376, 97 S.Ct. at 589, 50 L.Ed.2d at 561, *quoting Shively v. Bowlby,* 152 U.S. 1, 57–58, 14 S.Ct. 548, 569, 38 L.Ed. 331, 352 (1894)]; and that "conveyance by the United States of land riparian to a *navigable* river carries no interest in the riverbed.... After a State enters the Union, title to the land [under navigable waters] is governed by state law." (*Montana v. United States, supra,*

1. We use "reliction" to describe the process by which land is bared by the gradual recession of water. *But cf.,* R. Beck, *Boundary Litigation and Legislation in North Dakota,* 41 N.D.L.Rev. 424, 445 (1965), where Professor Beck observes that "dereliction" is the process by which land is bared by the gradual recession of water; that the baring of new land by a sudden change in the location of water "is 'reliction,' as contrasted

with 'dereliction' above" and that "[m]any courts and writers today refer to this swift change process in all of its aspects as avulsion and use reliction in the situation described above where they should be using dereliction."

2. Throughout its briefs the State used "OHWM" to abbreviate "ordinary high water mark."

450 U.S. at 551, 101 S.Ct. at 1251, 67 L.Ed. 2d at 501).

■ The concept of an ambulatory ordinary high water mark forming the boundary of land along a navigable body of water as an incident of the doctrine of reliction is not novel in this state. This court has recognized the movement of water marks forming boundaries. *See, e.g., Oberly v. Carpenter, supra,* where this court held in Syllabus ¶ 5:

"Where a *water line* is the boundary line of a given lot, that line, *no matter how it shifts, remains the boundary,* and *a deed* describing the lot by number or name *conveys the land up to such shifting line* exactly as it does up to a fixed side line and conveys all accretions thereto." (Emphasis added.)

*See also Jennings v. Shipp,* 115 N.W.2d 12, 13 (N.D.1962) ("The Missouri River ... has characteristically been known to undulate in varying degrees, thereby causing either accretion or reliction of property bounded by the river."); *Hogue v. Bourgois,* 71 N.W.2d 47, 52 (N.D.1955) ("The title of the State of North Dakota to lands below low water mark of a navigable stream is coextensive with the *bed of the stream as it may exist from time to time.").* (Emphasis added.)

Section 47–06–05, N.D.C.C., provides:

"*47–06–05. Riparian accretions.*— Where from natural causes land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank."

This court observed in *Hogue v. Bourgois, supra,* 71 N.W.2d at 53, that the statute "is essentially a restatement of the well-established common law rule governing riparian rights." The statute and the underlying doctrines of accretion and reliction have often been applied by this court to lakes and rivers in this state.[3] *See, e.g., Hogue v. Bourgois, supra,* 71 N.W.2d at 52 ("As the riparian owner acquires title to additions to his riparian lands by accretion and reliction, he likewise loses title to such portions as are eroded and washed away by a navigable stream."); *Roberts v. Taylor,* 47 N.D. 146, 181 N.W. 622, 626–627 (1921) ("As riparian owners, the parties were entitled to receive those additions, the alluvion so termed, to riparian land which accumulates through processes of accretion or reliction."); *Brignall v. Hannah, supra,* 157 N.W. at 1045 ("The owner of land fronting on a lake or pond is entitled to any land added to his frontage by accretion, or by the recession and withdrawal of the waters, provided that the process in either case, whether of accretion or reliction, was gradual and imperceptible.").

■ The State, however, argues that the doctrine of reliction is inapplicable to Devils Lake because the fluctuations of Devils Lake have not been permanent. This court, however, has recognized the applicability of the doctrines of accretion and reliction in situations involving something less than "permanent" change. *See, e.g., Oberly v. Carpenter, supra,* ("shifting" water lines); *Jennings v. Shipp, supra* ("undulating" Missouri River causes accretion and reliction); *Hogue v. Bourgois, supra,* (state's title is "coextensive with the bed of the stream as it may exist from time to time.").

Section 61–15–01, N.D.C.C., defines "ordinary high-water mark" as "that line reached by water when lake or stream is ordinarily full and the water ordinarily high." In *Rutten v. State,* 93 N.W.2d 796, 799 (N.D.1958), this court said:

" ' "High-water mark" means what its language imports—a water mark. It is co-ordinate with the limit of the bed of the water; and that only is to be considered the bed which the water occupies sufficiently long and continuously to wrest it from vegetation, and destroy its

---

**3.** Although § 47–06–05, N.D.C.C., refers only to rivers and streams, this court has applied it to lakes as well. In *Roberts v. Taylor,* 47 N.D. 146, 181 N.W. 622, 625 (1921), this court observed that "a lake is differentiated from a water course only in that it is simply an enlarged water course wherein the waters ... are quiescent."

value for agricultural purposes. * * * In some places, however, where the banks are low and flat, the water does not impress on the soil any well-defined line of demarcation between the bed and the banks.

" 'In such cases the effect of the water upon vegetation must be the principal test in determining the location of high-water mark as a line between the riparian owner and the public. It is the point up to which the presence and action of the water is so continuous as to destroy the value of the land for agricultural purposes by preventing the growth of vegetation, constituting what may be termed an ordinary agricultural crop.' " (Citations omitted.)

In that case, there was no evidence introduced to show an ordinary high water mark meeting the statutory definition.

■ In this case, however, evidence was introduced to show an ordinary high water mark. There was expert testimony that "based upon vegetation lines and strand lines" an ordinary high water mark is determinable; that the boundary of Devils Lake is "an ambulatory boundary;" that there is a "major change at the shoreline" at 1,426.2 feet above mean sea level; that there is a significant strand line at 1,426 feet; that the best evidence of long-term stability is at a level of 1,423 to 1,426 feet above mean sea level; and that there are no trees below 1,423 feet and there are fifty to sixty year-old trees in the area of 1,426 feet. In our view the evidence of an ordinary high water mark at an elevation of 1,426 feet above mean sea level is sufficient to establish an ordinary high water mark at that level and to warrant application of the doctrine of reliction. The evidence of fifty to sixty year-old trees at an elevation of 1,426 feet is particularly persuasive.

The State relies heavily upon the special master's report prepared in *Utah v. United States*, 420 U.S. 304, 95 S.Ct. 1153, 43 L.Ed.2d 211 (1975). In that report, the special master determined that "the meander line is believed to be the most reasonable answer to the questions posed" in

determining the ordinary high water mark of the Great Salt Lake. The State asserts that the physical characteristics of Devils Lake and Great Salt Lake are similar and, therefore, the meander line should be determined to be the ordinary high water mark of Devils Lake. The parties in *Utah v. United States, supra*, however, stipulated:

"Neither a vegetation nor an erosion line can be identified on the shores of the Great Salt Lake. The exceedingly high salt content of the Lake accounts for the absence of a vegetation line, and various other factors, such as the flat shorelands, account for the lack of erosion line.

"As a result, the Court must devise another basis to determine the boundary of the bed of the Lake at any given time."

In the instant case, vegetation lines and strand lines provide an ordinary high water mark upon the shore of Devils Lake and it is unnecessary to "devise another basis to determine the boundary of the bed" of Devils Lake. The special master's report in *Utah v. United States, supra*, is, therefore, inapposite.

The judgment is affirmed.

LEVINE, Acting C.J., and MESCHKE and VANDE WALLE, JJ., concur.

VERNON R. PEDERSON, Surrogate Justice, sitting in place of ERICKSTAD, C.J., disqualified.

VERNON R. PEDERSON, Surrogate Justice, dissenting.

In the past, this court has ruled that the state's interest in a lake bottom and in the lands surrounding a navigable lake are lost to abutting private owners as the high water line recedes. Because the public trust doctrine was not considered, those rulings should not be relied upon as precedent in this case.

It is now clearly determined that certain property held in trust for the public cannot be alienated. See *United Plainsmen v. N.D. State Water Com.*, 247 N.W.2d 457 (N.D.1976); *Saetz v. Heiser*, 240 N.W.2d 67

(N.D.1976); *Small v. Burleigh County,* 225 N.W.2d 295 (N.D.1974); *Wenberg v. Gibbs Tp.,* 153 N.W. 440, 31 N.D. 46 (1915); and *Walkott Township v. Skauge,* 71 N.W. 544, 6 N.D. 382 (1897). See also *Nat. Audubon Soc. v. Super. Ct. of Alpine Cty.* 658 P.2d 709, 33 Cal.3d 419, 189 Cal.Rptr. 346 (1983).

Although everything said in *Utah v. United States,* 420 U.S. 304, 95 S.Ct. 1153, 43 L.Ed.2d 211 (1975) does not fully apply to this case, it's reasoning is persuasive. It avoids what otherwise can be absurd results and supports the proposition that when other solutions are not reasonable, a meander line does provide a reasonable answer. A constantly moving property line can lead to absurd results (e.g. ownership of and right to produce oil or other minerals) and, in my view, provides no reasonable real property boundary for title purposes.

The judgment should be reversed.