NORTH SHORE, INC., Plaintiff
and Appellant,

v.

Daniel V. WAKEFIELD, Luella M. Schafer, and all other persons unknown claiming any estate or interest in, or lien or encumbrance upon, the property described in the complaint, Defendants and Appellees.

Civ. No. 940053.

Supreme Court of North Dakota.

March 16, 1995.

Murray G. Sagsveen (argued), Zuger Kirmis & Smith, Bismarck, for plaintiff and appellant.

Joseph J. Cichy (argued), Olson Cichy, Bismarck, for defendants and appellees.

NEUMANN, Justice.

North Shore, Inc., appealed from a judgment quieting title in certain land to Daniel V. Wakefield and Luella M. Schafer and awarding Wakefield and Schafer $34,491, plus costs, for damages to that land. We affirm.

## I

The land involved in this case is referred to by the parties as riparian land between the meander line[1] and the ordinary high watermark of Devils Lake and is adjacent to government Lots 1 and 2 in Section 14 and government Lot 1 in Section 23 in Grand Harbor Township (T153N–R65W), Ramsey County. The parties all trace their claims to the riparian land from a common source, Frank A. Walford. Walford platted three subdivisions in government Lot 1 in Section 23, and in 1975, he conveyed a lot in one of those subdivisions, Walford's Second Main Lakeview Subdivision, by contract for deed to Leo and Luella Schafer. Leo died, and Luella now owns that lot. The meander line of Devils Lake is located on the southeast side of Schafer's lot.

Walford died in 1978. As relevant to this case, three conveyances were made involving his remaining land. In May 1981, Walford's heirs conveyed a tract of land in Section 14, now platted as the North Shore subdivision, by warranty deed to North Shore's predecessor in interest, North Shore Heights Limited Partnership. The meander line of Devils Lake is located on the southeast side of that tract of land. The south boundary of that tract is the section line between Sections 14 and 23, and the northeast boundary is established by a 1968 agreement between Walford and a neighbor.

On September 14, 1982, Walford's heirs conveyed a contiguous tract of land in Sections 14 and 23 by warranty deed to Julian and Rose Kostecki. On September 29, 1982, the Kosteckis conveyed part of that land, now known as the Wakefield Addition, by warranty deed to Wakefield. Most of the Wakefield Addition is west of the North Shore subdivision in Section 14 and is not adjacent to Devils Lake. However, the Wakefield Addition includes a strip of land in Section 23, which lies between the North Shore subdivision and Schafer's lot and has 40 feet of frontage on the meander line of Devils Lake.

North Shore began developing its subdivision and moved some dirt and landfill to the

---

1. A meander line is an artificial line determined by surveyors. It attempts to approximate the natural curving edge of a navigable body of water by a series of angles and straight lines. *See* Black's Law Dictionary, p. 884 (5th ed. 1979).

Technically, riparian means "belonging or relating to the bank of a river or stream; of or on the bank," and "littoral" means "boarding [an] ocean, sea, or lake." Black's Law Dictionary, pp. 1192, 842 (5th ed. 1979). Throughout this opinion, we, like the parties, refer to the land between the meander line and the ordinary high watermark of Devils Lake as riparian land.

riparian land in Section 23. By virtue of their ownership of the upland, Wakefield and Schafer claimed ownership of that riparian land. North Shore thereafter obtained quit claim deeds from the Walford heirs for the riparian land next to its subdivision in Section 14 and from the Kosteckis for the riparian land next to the Wakefield Addition in Section 23. North Shore then brought this action against Wakefield and Schafer to quiet title to the riparian land in Section 23. Wakefield and Schafer counterclaimed to quiet title and seek damages for North Shore's activities on the land.

The trial court decided the action in three phases. First, the court construed the deeds that conveyed the land to the parties and concluded that the Kosteckis' warranty deed to Wakefield conveyed riparian land in Section 23 to Wakefield. The court granted summary judgment in favor of Wakefield and Schafer, holding, as a matter of law, that they owned riparian land in Section 23. After a bench trial in the second phase, the court divided the riparian and accreted land among the parties. In the third phase, the court awarded Wakefield and Schafer $34,491, plus costs, for damages to their land. North Shore appealed.

## II

We initially consider the issue about ownership of riparian land in Section 23. The parties agree that, at statehood, Devils Lake was a navigable body of water. *See Matter of Ownership of Bed of Devils Lake*, 423 N.W.2d 141 (N.D.1988); *Rutten v. State*, 93 N.W.2d 796 (N.D.1958). They also agree that Walford initially owned all the upland and associated riparian land. They further agree that the Walford heirs conveyed the riparian land associated with the upland when they conveyed the respective tracts of upland to the Kosteckis and to North Shore. However, North Shore argues that the Kosteckis' warranty deed to Wakefield is unambiguous and conveyed only the specific tract of upland described therein by metes and bounds and by acres, and did not convey any riparian land in Section 23 to Wakefield. Alternatively, North Shore asserts that the Kosteckis' deed is ambiguous, creating a factual issue about the parties' intent, which, North Shore argues, must be resolved in its favor because the Kosteckis did not intend to convey any riparian land in Section 23 to Wakefield. In either case, North Shore argues that the Kosteckis' later quit claim deed granted it the riparian land in Section 23.

We review this issue in the context of summary judgment, a procedural device for the prompt and expeditious disposition of a controversy without a trial if there is no genuine issue of material fact or inferences to be drawn from undisputed facts, or if only a question of law is involved. *State Farm Mutual Auto Insurance Co. v. LaRoque*, 486 N.W.2d 235 (N.D.1992). Even if a factual dispute exists, summary judgment is appropriate if the law is such that the resolution of the factual dispute will not change the result. *Striegel v. Dakota Hills, Inc.*, 365 N.W.2d 491 (N.D.1985).

The Kosteckis' warranty deed to Wakefield described the conveyed property by metes and bounds and specified that it conveyed 1.75 acres in Section 23 to Wakefield. However, the deed also described the lake side boundary of the property in Section 23 as "along the meander line of Devils Lake." [2]

2. The Kosteckis' warranty deed to Wakefield described the conveyed land:

"A tract of land situated in part of Lot 1, Section 14 and part of Lot 1, Section 23, Township 153N, Range 65W, being more particularly described as follows: *Beginning at the meander corner common to said Sections 14 and 23; thence South 35°0'54" West in Section 23 along the meander line of Devils Lake a distance of 40.28 feet;* thence North 89°58'17" West along the north line of Walford's Third Main Lakeview Subdivision, a distance of 341.89 feet; thence South 34°52'54" West along said subdivision a distance of 37.87 feet; thence South 84°46'26" West along said subdivision a distance of 673.94 feet; thence North 0°02'25" West a distance of 125.81 feet to a point on the north line of said Section 23; thence continuing in said Section 14 a distance of 814.05 feet; thence South 89°58'17" East a distance of 518.05 feet; thence South 0°02'25" East a distance of 814.06 feet to a point on the south line of said Section 14; thence South 89°58'17" East along said section line a distance of 539.85 feet to the point of beginning. Said tract of land contains 9.68 acres more or less in said Section 14 and 1.75 acres more or less in said Section 23 and is subject to Easements and Right-of-Ways as shown of record

This issue involves the effect of that deed's designation of the boundary of the conveyed property as "along the meander line."

■ Under our rules for construing grants of real property and our rules for determining ownership of riparian land and accretions, we hold that unless a deed indicates a contrary intent with an explicit reservation or exception, or the record title indicates a prior separation of the upland and the riparian land, a deed that designates a meander line as the boundary of a conveyance conveys the grantor's property interest to the ordinary high watermark, and also correlative interests vis-a-vis the State in the area between the ordinary high watermark and the ordinary low watermark.

Chapter 47–09, N.D.C.C., outlines specific rules for construing grants of real property. Section 47–09–11, N.D.C.C., says that "[g]rants shall be interpreted in like manner with contracts in general except so far as is otherwise provided by this chapter." Under N.D.C.C. § 47–09–13, "[a] grant shall be interpreted in favor of the grantee, except that a reservation in any grant ... is to be interpreted in favor of the grantor." Section 47–09–16, N.D.C.C., provides that "[a] transfer vests in the transferee all the actual title to the thing transferred which the transferor then has unless a different intention is expressed or is necessarily implied. It also transfers all its incidents unless expressly excepted, but the transfer of an incident to a thing does not transfer the thing itself."

■ The language of the deed, if clear and explicit, governs its interpretation; the parties' mutual intentions must be ascertained from the four corners of the deed, if possible. N.D.C.C. §§ 9–07–02, 9–07–03, 9–07–04. E.g., *Royse v. Easter Seal Society for Crippled Children and Adults, Inc.,* 256 N.W.2d 542 (N.D.1977). Although a court may look to the circumstances under which a deed was made to explain ambiguous language, *Mueller v. Stangeland,* 340 N.W.2d 450 (N.D. 1983), we have said that exceptions or reservations of property in a deed should be set forth with the same prominence as the property granted and should be so explicit as to leave no room for doubt. *Royse v. Easter Seal Society for Crippled Children and Adults, Inc., supra.* In order to promote certainty from the four corners of a deed and from the record title, our rules for construing deeds thus express a preference for clear and explicit reservations or exceptions in a deed. *Id.* See generally Anderson & Edin, *The Growing Uncertainty of Real Estate Titles,* 65 N.D.L.Rev. 1 (1989).

Our statutes also outline specific rules for construing conveyances of upland and determining ownership of riparian land and accretions.[3] Section 47–01–15, N.D.C.C., says that "[e]xcept when the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on a navigable lake or stream, takes to the edge of the lake or stream at low watermark." In *State ex rel. Sprynczynatyk v. Mills,* 523 N.W.2d 537 (N.D.1994), we recently held that N.D.C.C. § 47–01–15 is a rule of construction

---

in the office of the Register of Deeds in and for Ramsey County, North Dakota. TO HAVE AND TO HOLD THE SAME, Together with all the hereditaments and appurtenances thereunto...." [Emphasis added].

We also note that Walford's heirs' warranty deed to the Kosteckis described a 6.9 acre tract of land in Section 23 by metes and bounds and also specified the lake side boundary as "along said meander line a distance of 40.28 feet."

**3.** In *J.P. Furlong Enterprises, Inc. v. Sun Exploration and Production Co.,* 423 N.W.2d 130, 133 n. 4 (N.D.1988), we defined the processes of accretion, erosion, avulsion, and reliction:

" 'Accretion' refers to the gradual deposit and addition of soil along the bank of a water-

body caused by the gradual shift of the waterbody away from the accreting bank.

" 'Erosion' refers to the gradual loss of soil along the bank of a waterbody caused by the gradual encroachment of water into the eroding bank.

" 'Avulsion' refers to the sudden inundation or sweeping away of land resulting from a sudden change in the course of a waterbody.

"Technically, 'reliction' refers to the sudden baring of land resulting from a sudden change in the course of a waterbody. However, the word 'reliction' is also commonly used to describe the gradual receding of water resulting in the gradual baring of previously submerged land."

See also *Matter of Ownership of Bed of Devils Lake,* 423 N.W.2d 141, 143 n. 1 (N.D.1988).

under which an upland owner "takes" the interest granted in a conveying instrument to the low watermark, "[e]xcept when the grant under which the land is held indicates a different intent." We held that the interests of a riparian grantee and the State in the area between the ordinary high watermark and the ordinary low watermark were not absolute, and that both parties had correlative interests in that area.

A related statute, N.D.C.C. § 47–06–05, provides that "[w]here from natural causes land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank." Under that statute, we have consistently said that, in the event of accretion and reliction, any accreted or bared land belongs to the owner of the bank. *J.P. Furlong Enterprises, Inc. v. Sun Exploration and Production Co.,* 423 N.W.2d 130 (N.D.1988); *Matter of Ownership of Bed of Devils Lake, supra; Oberly v. Carpenter,* 67 N.D. 495, 274 N.W. 509 (1937); *Gardner v. Green,* 67 N.D. 268, 271 N.W. 775 (1937); *Heald v. Yumisko,* 7 N.D. 422, 75 N.W. 806 (1898). In *Matter of Ownership of Bed of Devils Lake, supra,* we held that, under N.D.C.C. § 47–06–05 and the doctrine of reliction, riparian landowners were entitled to additions to their land to the ambulatory ordinary high watermark of Devils Lake.

Under *Mills, supra,* and *Matter of Ownership of Bed of Devils Lake, supra,* and the related statutes, an upland owner owns riparian land to the ambulatory ordinary high watermark and has correlative interests vis-a-vis the State in the area between the ordinary high watermark and the ordinary low watermark, *except when the grant under which the land is held indicates a different intent. See Greeman v. Smith,* 138 N.W.2d 433, 438 (N.D.1965) "[u]nless an instrument

shows a contrary intention, accretion is included in any description of land to which it is appurtenant." *See also* 1 Patton on Titles, § 161 (2d ed. 1957); 2 Patton on Titles, § 304 (2d ed. 1957); 65 C.J.S., *Navigable Waters* §§ 82(1), 122(b) (1966).

■ Those authorities support the general rule that, unless the parties intend otherwise, the water line, not the meander line, is the boundary of a tract of land abutting a navigable body of water.[4] *See* 1 Patton on Titles, *supra,* at § 117; 12 Am.Jur.2d, *Boundaries* § 29 (1964); 78 Am.Jur.2d, *Waters* § 414 (1975); 11 C.J.S., *Boundaries* § 30 (1938).

■ The issue in this case is how that intent may be manifested and whether the designation of the meander line as a boundary manifests a different intent. A meander line is not an actual boundary; it is merely a line used in surveying fractional portions of land bordering upon a navigable body of water. Its purpose is to define the "sinuosities"—the natural curves—of the bank of the body of water, and also to ascertain the quantity of land for which the purchaser must pay. *Oberly v. Carpenter, supra; Gardner v. Green, supra; Heald v. Yumisko, supra. See Railroad Co. v. Schurmeir,* 7 Wall. 272, 19 L.Ed. 74 (1868). *See generally* R. Beck, *Boundary Litigation and Legislation in North Dakota,* 41 N.D.L.Rev. 424 (1965); 1 Patton on Titles, *supra* at § 117; Clark on Surveying and Boundaries, §§ 257, 259 (4th ed. 1976); 12 Am.Jur.2d, *Boundaries, supra* at §§ 29, 30; 11 C.J.S., *Boundaries, supra* at § 30; 65 C.J.S., *Navigable Waters, supra* at § 122.

In *Matter of Ownership of Bed of Devils Lake, supra,* 423 N.W.2d at 143, we said

"that a water line, rather than a meander line, ordinarily forms the boundary of a tract of land abutting a navigable body of water. *See, e.g., Ozark–Mahoning Co. v. State,* 76 N.D. 464, 37 N.W.2d 488 (1949);

---

4. We also note that, in determining whether a shore line or a meander line is a boundary, courts occasionally consider whether there was fraud or a mistake in establishing the original meander line. Clark on Surveying and Boundaries, § 268 (4th ed. 1976); 12 Am.Jur.2d, *Boundaries* § 32 (1964); 1 Patton on Titles, § 117 (2d ed. 1957); *see Brignall v. Hannah,* 34

N.D. 174, 157 N.W. 1042 (1916); *see also Jeems Bayou Fishing and Hunting Club v. United States,* 260 U.S. 561, 43 S.Ct. 205, 67 L.Ed. 402 (1923); *Schultz v. Winther,* 10 Wis.2d 1, 101 N.W.2d 631 (1960). Here, North Shore does not assert there was fraud or a mistake in establishing the meander line in the original government survey in 1883.

*State v. Brace,* 76 N.D. 314, 36 N.W.2d 330 (1949); *Oberly v. Carpenter,* 67 N.D. 495, 274 N.W. 509 (1937); *Gardner v. Green,* 67 N.D. 268, 271 N.W. 775 (1937); *Brignall v. Hannah,* 34 N.D. 174, 157 N.W. 1042 (1916); *Heald v. Yumisko,* 7 N.D. 422, 75 N.W. 806 (1898); ..."

Two cases from that quotation are especially instructive on the interpretation of the designation of a meander line as a boundary in a deed. In *Oberly v. Carpenter, supra,* we considered ownership of accretions formed by a gradual recession of the Missouri River. In that case, an upland lot was located on the meander line, and a deed described the upland by lot number and by acres. We rejected the argument that the terms of the grant described a clear limitation of the quantity of land conveyed. We noted there were no material reservations in the deed and nothing in the record to indicate any intent to reserve the accretions. Relying on the predecessors to N.D.C.C. §§ 47–01–15 and 47–06–05, we held that where the water line is the boundary of a given lot, that line, no matter how it shifts, remains the boundary of the lot, and a deed describing the lot by its number and acres conveys the land to the shifting water line exactly as it does to a fixed line.

In *Heald v. Yumisko, supra,* we considered a similar issue about the boundary of upland described by lot number and by acres. We distinguished two cases in which a party owned a tract of land on a meander line and the government had previously surveyed and sold other tracts of land between the meander line and the water line. *See Lammers v. Nissen,* 4 Neb. 245, (1876), *aff'd,* 154 U.S. 650, 14 S.Ct. 1189, 25 L.Ed. 562 (1879); *Bissell v. Fletcher,* 19 Neb. 725, 28 N.W. 303 (1886). In *Heald,* 75 N.W. at 808, we recognized the principle that whether or not a meander line is a boundary may be determined by "evidence aliunde." However, we said that the record in that case did not demonstrate that the government claimed any interest in, or that there had been any prior conveyances of, land between the meander line and the water line. We thus held that the water line, not the meander line, represented the boundary of the upland.

However, in *Jennings v. Shipp,* 115 N.W.2d 12 (N.D.1962), we relied on *Lynch v. Kupfer,* 134 Cal.App. 652, 26 P.2d 33 (1933), as support for the statement that there is a rebuttable presumption that a conveyance of upland includes accretions and that evidence may show an intent to separate the upland from accretions. In *Lynch v. Kupfer, supra,* the record title showed a prior judgment that separated the upland from accretions. In *Jennings v. Shipp, supra,* the current upland owner of a tract of land next to accretions on the Missouri River was not a party to a lawsuit seeking a division of the accretions. In the absence of a claim by that upland owner and in view of the claim by the former upland owner that he had retained the accretions when he conveyed the land to the current upland owner, we said that the former upland owner had a sufficient interest in the accretions to maintain an action to quiet title to those accretions against other neighboring upland owners. *Jennings* thus also involved a prior separation of the upland and accretions. *Compare Heald v. Yumisko, supra* (distinguishing cases involving prior conveyances separating land above meander line from land below meander line).

We believe the effect of those decisions is that an intent to separate the upland from riparian land must be shown by an explicit reservation or exception in the grant conveying the upland, or by a prior conveyance or separation of the interests in the record title. That result follows from our rules of interpretation that a transfer vests in the transferee all the actual title to the thing transferred which the transferor then has unless a different intent is expressed or necessarily implied, N.D.C.C. § 47–09–11, and that, except when the grant under which the land is held indicates a different intent, the owner of upland takes to the low watermark, N.D.C.C. § 47–01–15.

We hold that, except when the record title establishes a prior conveyance or separation of the upland and riparian land, or a grant explicitly indicates a different intent by an explicit reservation or exception, a deed that designates a meander line as a boundary conveys the grantor's interest in the property to the ordinary high watermark, and also

correlative interests vis-a-vis the State in the area between the ordinary high watermark and ordinary low watermark. We do so to preserve a degree of certainty for conveyances of interests in land. *See Kim–Go v. J.P. Furlong Enterprises, Inc.,* 460 N.W.2d 694 (N.D.1990); *Royse v. Easter Seal Society for Crippled Children and Adults, Inc., supra. See generally* Anderson & Edin, *supra.*

■ Here, there is no explicit reservation or exception of any interest in the Kosteckis' warranty deed to Wakefield, and the record title does not indicate that the upland and riparian land had been previously separated. Under these circumstances, the legal effect of the designation of the meander line as a boundary in the Kosteckis' warranty deed to Wakefield was to convey riparian land to Wakefield. The trial court did not err in construing the deeds.

### III

■ North Shore argues that the trial court erred in apportioning the riparian land. We disagree.

In *Gardner v. Green, supra,* 271 N.W. at 783, we said:

"The fundamental theory underlying the ownership of accretions is that each of the several riparian owners shall have a frontage on the new shore proportionate to his frontage on the old one, connecting their respective points by straight lines. A common principle which pervades all modes of division is that no regard is paid to the direction of the side lines between contiguous owners, but the reference is solely to the shore line. . . .

"The main objects to be kept in view in any division of accretions is that the division shall be equitable and that it shall be proportional so as to give each shore owner a fair share of the land to be divided and his due portion of the new shore line proportionate to his share on the original line of the water."

In *Gardner, supra,* 271 N.W. at 783, accretions were apportioned by first extending a boundary from the meander line to the shore line as it existed at the time of the government survey for "the purpose of establishing the boundaries of the tracts as they were laid out, and to divide land then in existence between the meander line, as shown on the plat, and the shore line of the river." *Compare Jennings v. Shipp, supra* (meander line and shore line were same at time of government survey so the boundary of the original lot was the meander line). Once the boundaries of the lots, as they existed at the time of the original government survey, are determined, "[l]and formed subsequent to the time the lots were laid out must be apportioned among the owners of lands fronting on the river in accordance with the rules applicable to the apportionment of accretions." *Gardner v. Green, supra,* 271 N.W. at 783. Those rules for apportionment require allocation of the new shore line in proportion to each owner's share of the original shore line. *Id.; Jennings v. Shipp, supra.*

Here, the trial court extended the boundaries for the three tracts of land from the meander line to the shore line as it existed at the time of the original government survey in 1883. That extension established the boundaries of the three tracts of land to the shore line as it existed in 1883 and resulted in a 264 foot eastern extension of the section line between sections 23 and 14. Based on the extension of those boundaries, the total length of the 1883 shore line for these three tracts of land was 1530 feet, with North Shore having a shore line of 1128 feet, Wakefield having a shore line of 42 feet, and Schafer having a shore line of 360 feet. The court then found that the shore line at the time of trial was located at 1424 feet mean sea level (msl). The court extended the northeast boundary of North Shore's land and the southwest boundary of Schafer's land to that level, and found the length of the shore line at the time of trial was 2472 feet. The court then apportioned that shore line among the parties in proportion to their share of the shore line as it existed in 1883 and connected the end points. As a result, North Shore received 1828 feet on the new shore line, Wakefield received 60 feet, and Schafer received 584 feet, and the northern boundary of Wakefield's accretions was set at a seven degree angle south from the section

line between sections 14 and 23. *See* attached Exhibit.

The trial court's decision followed the method for equitably apportioning accretions set out in *Gardner v. Green, supra,* and *Jennings v. Shipp, supra.* Although North Shore's proposed method for apportionment, drawing lines from the upland owners' frontage on the meander line to the center of Devils Lake, might equitably apportion accretions for a circular body of water, we are not persuaded that method would result in an equitable apportionment of accretions for an irregular body of water like Devils Lake. *See* 78 Am.Jur.2d, *Waters* § 399 (1975) ("In cases where the irregularity of shape prevents the drawing of divisional lines to a common center or to a median line, the lines will be drawn in such a way as to give each upland owner an area in proportion to the shore frontage."). We conclude the trial court did not err in apportioning the riparian land.

### IV

North Shore asserts that the trial court clearly erred in awarding damages to the defendants. The trial court found that North Shore damaged the defendants' land by placing approximately 3556 cubic yards of fill over 1.8 acres of the land and awarded them damages based upon their proposed method of restoration.

Section 32–03–09.1, N.D.C.C., says:

*"Measure of damages for injury to property not arising from contract.*—The measure of damages for injury to property caused by the breach of an obligation not arising from contract, except when otherwise expressly provided by law, is presumed to be the reasonable cost of repairs necessary to restore the property to the condition it was in immediately before the injury was inflicted and the reasonable value of the loss of use pending restoration of the property, unless restoration of the property within a reasonable period of time is impossible or impracticable, in which case the measure of damages is presumed to be the difference between the market value of the property immediately before and immediately after the injury

and the reasonable value of the loss of use pending replacement of the property. Restoration of the property shall be deemed impracticable when the reasonable cost of necessary repairs and the reasonable value of the loss of use pending restoration is greater than the amount by which the market value of the property has been diminished because of the injury and the reasonable value of the loss of use pending replacement."

In *Lang v. Wonnenberg,* 455 N.W.2d 832, 839 (N.D.1990), we said that "when either diminution in value or cost of restoration are appropriate measures of damages in a given case, the [party seeking recovery] has the right to elect the measure deemed more accurate and if the [opposing party] disagrees, he has the burden to prove the alternative measure is more appropriate." Once the appropriate measure of damages is determined, a trial court's findings on the amount of damages is a finding of fact, subject to the clearly erroneous standard of N.D.R.Civ.P. 52(a). *West v. Carlson,* 454 N.W.2d 307 (N.D.1990); *Pfliger v. Peavey Co.,* 310 N.W.2d 742 (N.D.1981).

At trial in this case, the parties presented two alternative methods for restoring the land. The defendants' method of restoration required removing the fill placed on the land by North Shore and restoring the land to its previous condition. They presented evidence that the estimated cost to remove the fill was $17,121, the estimated cost to restore the land to its previous condition ranged from $10,089.28 to $11,869.74, and the loss of use ranged from $6,300 for three years to $12,600 for six years.

North Shore presented evidence contradicting those estimated costs of restoration. Additionally, North Shore presented evidence that its method of restoration involved leveling the fill, spreading additional topsoil, and seeding grass on the land. North Shore presented evidence that the estimated cost for its method of restoration was $10,500. It further claimed that it had already spent $7,000 "to clean up the tract" and sought an offset of that amount against its estimated cost of restoration. In its post-trial brief,

North Shore limited its argument on damages to costs of restoration and indicated diminution in value was inappropriate because "the witnesses indicated that restoration would be possible in a reasonable period of time."

The trial of the issue of damages essentially boiled down to a choice between two methods of restoring the property. The trial court adopted the defendants' method of restoration and awarded the defendants $17,121 for fill removal, $10,170 for revegetation of the property, and $7,200 for loss of use of the property, for total damages of $34,491. The court essentially adopted the defendants' evidence regarding their estimated costs to restore the riparian land. The trial court concluded the defendants had the right to restoration under their proposed method of reclamation and denied North Shore's claim for a setoff.

We agree with the trial court that North Shore's method of restoration "would force the Defendants to use the land as [North Shore] wanted it used." We are not persuaded that the court erred in adopting the defendants' proposed method of restoration and in rejecting North Shore's proposed method of restoration and claim for a setoff. Under N.D.R.Civ.P. 52(a), we are not left with a definite and firm conviction that the trial court's findings on the costs to restore the land are wrong. We therefore conclude the trial court's findings on the amount of damages are not clearly erroneous. N.D.R.Civ.P. 52(a).

We affirm the judgment.

VANDE WALLE, C.J., and LEVINE, MESCHKE and SANDSTROM, JJ., concur.