1998 ND 91

**Sidney NORD, Joyce Nord, Lyder Nord, and Gloria M. Nord, Plaintiffs and Appellees,**

v.

**David HERRMAN and Richard Herrman, Defendants and Appellants.**

and

**Arlen Peterson, Intervenor and Appellant.**

**Civil No. 970161.**

Supreme Court of North Dakota.

April 28, 1998.

Rehearing Denied May 20, 1998.

Todd A. Schwarz, of Frith, Schwarz & Steffan, Devils Lake, for plaintiffs and appellees. Submitted on brief.

J. Thomas Traynor, Jr., of Traynor, Rutten & Traynor, Devils Lake, and Maren H. Halbach, of Haugland, Halbach & Halbach, Devils Lake, for defendants, intervenor, and appellants. Submitted on brief.

MARING, Justice.

[¶ 1] David Herrman, Richard Herrman and Arlen Peterson appealed from a judgment quieting title to real property located on the shoreline of Devils Lake, and awarding Sidney, Joyce, Lyder, and Gloria M. Nord $2,500 in damages to the property and $500 in attorney fees. We hold the trial court's decision does not adequately meet the legal requirement of proportional allocation, and we reverse and remand for further proceedings.

I

[¶ 2] In May 1982 the Nords bought from Ted and Jan Shelver a 1.69 acre tract of Ramsey County land located in Lot 4, Section 18, Township 153N, Range 63W. The property is located along the shoreline of Devils Lake's East Bay and was purchased by the Nords for a family retreat. The deed description used the meander line[1] as the waterside boundary. In July 1982 the Shelvers transferred to the Nords an additional .42 acres in Lot 4 to correct the description

in the earlier conveyance. The same meander line was again used as the waterside boundary.

[¶ 3] In June 1983 the Shelvers created and platted a subdivision called Old Townsite Estates in Lot 4.[2] Old Townsite Estates used the same meander line as the waterside boundary and was adjacent to the northwest side of the Nords' property.

[¶ 4] In May and August 1987 the Herrmans acquired from the Shelvers and Cordell Dobson Lots 4 and 7 of Block 2 in Old Townsite Estates. Lot 7 is immediately adjacent to and northwest of the Nords' property. In April 1987 Arlen Peterson acquired from the Shelvers Lots 5 and 6 of Block 2 in Old Townsite Estates. The deed also granted to Peterson any riparian land[3] pertaining to the two lots.

[¶ 5] The Nords improved their property above and below the meander line by removing rocks and old tree stumps and mowing a part of the property they regularly used for camping and family gatherings. The Nords also placed a small mobile home and campfire pit on the property, and fenced a part of the property on the boundary between the Herrmans' Lot 7 and their own property.

[¶ 6] In the late 1980s the level of Devils Lake receded, exposing more land. The Herrmans and Peterson began to exercise control over the property immediately in front of their lake lots. The Nords, however, began using their property less because of disputes with the Herrmans over ownership of the now exposed property below the meander line. David Herrman and Peterson cut down trees which had formed a tree border between the Nord and Herrman properties, rolled up the boundary fence, and pushed large rocks from the front of their lots onto the Nord property.

[¶ 7] Sidney Nord believed their property extended from the meander line to the wa-

---

1. A meander line is an artificial line determined by surveyors which attempts to approximate the natural curving edge of a navigable body of water by a series of angles and straight lines. *See North Shore, Inc. v. Wakefield,* 530 N.W.2d 297, 298 n. 1 (N.D.1995).

2. A map of Old Townsite Estates, referred to by the trial court in its decision, is included for reference in Appendix "A."

3. Riparian means " 'belonging or relating to the bank of a river or stream; of or on the bank.' " *North Shore* (quoting Black's Law Dictionary, p. 1192 (5th ed.1979)).

ter's edge following a line extending straight west along the north boundary of their property. Herrman and Peterson claimed their property interest extended down to the water because the Shelvers had told them they would have lake access off of their land to the water's edge. Herrman said he removed the trees because he believed they were on his property. On Memorial Day 1989, a confrontation occurred and the Nords told the Herrmans to stay off of their property. The Nords, however, allowed Peterson to use a 20 foot strip across their property so he would have access to the lake.

[¶ 8] In September 1992 the Nords sued the Herrmans seeking a declaratory judgment that the property which they believed they owned below the meander line was theirs to enjoy free of any claims of the Herrmans. The Nords also sought damages for injury to their property caused by the Herrmans. The Herrmans asserted they owned the disputed property and counterclaimed for damages resulting from the Nords' acts of trespass. In September 1995 the trial court allowed Peterson to intervene in the lawsuit. Peterson's claims against the Nords essentially parroted those of the Herrmans. By the time the case was tried to the court without a jury, the waters of Devils Lake had risen, inundating a substantial portion of the disputed property.

[¶ 9] The court issued its decision in January 1997, 16 months after trial. The court concluded this Court's decisions in *Matter of Ownership of Bed of Devils Lake,* 423 N.W.2d 141 (N.D.1988) and *North Shore, Inc. v. Wakefield,* 530 N.W.2d 297 (N.D. 1995), governed the parties' property dispute. The court reasoned:

> All of the deeds of the parties used the meander line as the boundary of the conveyance. The Peterson Quit Claim Deed is the only deed reserving (sic) any riparian land. It is common for the legal description in deeds affecting upland tracts around Devils Lake to use the meander line as boundary. Plaintiffs purchased property before the Defendants or Intervenor owned the lots in the subdivision.

> From *Matter of Ownership of Bed of Devils Lake,* 423 N.W.2d 141 (N.D.1988), an upland owner owns riparian land to the ambulatory ordinary high watermark and has correlative interests vis-a-vis the State in the area between the ordinary high watermark and the ordinary low watermark *except when the grant under which the land is held indicates a different intent.* Thus, the water line when it is below the meander line becomes the land boundary. Thereafter, the rules of apportionment require allocation of any new shoreline in proportion to each owner's share of the original shoreline. *North Shore v. Wakefield,* 530 N.W.2d 297 (N.D.1995).

> Based upon first ownership rights, and language in the deeds, the side line on the north side of the Nord property is extended westerly to the ambulatory ordinary high watermark which has been established at an elevation of 1426 feet above sea level. This extension is in conformity with the section line extension in the *North Shore* case. This ruling still preserves a limited riparian land interest as granted in the Peterson deed below the meander line, but first excludes the property awarded to the Plaintiff by the extension to the westerly line. (See attached map.) Below the 1426 elevation, the shoreline is apportioned in proportion to each owner's share of the shoreline at the 1426 elevation.

[Emphasis in original].[4]

[¶ 10] The court awarded the Nords $2,500 damages for "fence improvements" and "trees" on their property, finding the damages were not as much as the Nords claimed because the "rising waters would have destroyed many trees and improvements as with all lake shore property around Devils Lake." The court awarded the Nords $500 in attorney fees and dismissed the Herrmans' and Peterson's counterclaims. The Herrmans and Peterson appealed.

## II

[¶ 11] The Nords assert the appeal should be dismissed because the case is moot. They claim because the lake's waters have risen, all of the boundary lines in ques-

---

4. The "attached map" is included for reference in Appendix "B."

tion are below the meander line and are presently under water. The Nords argue no effective relief can be given at this time, and therefore, the boundary line issue is moot.

[¶ 12] This Court cannot render advisory opinions. *See Ashley Education Association v. Ashley Public School District*, 556 N.W.2d 666, 668 (N.D.1996). The premise behind the prohibition of advisory opinions is there must be an actual controversy to be determined before a court can properly adjudicate. *See Bies v. Obregon*, 1997 ND 18, ¶ 9, 558 N.W.2d 855. An actual controversy does not exist when an issue has been mooted by a lapse of time, or the occurrence of related events which make it impossible for a court to render effective relief. *See State v. Dalman*, 520 N.W.2d 860, 862 (N.D.1994). Nevertheless, an issue technically moot will not be considered moot if it is capable of repetition yet evading review, *see State v. Liberty Nat'l Bank and Trust Co.*, 427 N.W.2d 307, 309 (N.D.), *cert. denied*, 488 U.S. 956, 109 S.Ct. 393, 102 L.Ed.2d 382 (1988), or if the controversy is one of great public interest and involves the power and authority of public officials. *See Medical Arts Clinic v. Franciscan Initiatives*, 531 N.W.2d 289, 294 (N.D.1995).

[¶ 13] In *North Shore, Inc. v. Wakefield*, 542 N.W.2d 725 (N.D.1996), this Court confronted an argument similar to the Nords' assertion in this case. The appellant asserted the trial court erred in denying its motion for relief under *N.D.R.Civ.P. 60(b)(vi)* from paying the appellees damages for future loss of use of their property because it actually was the recent flooding of Devils Lake that prevented the property from being used. This Court rejected the argument:

> It is not an exceptional circumstance for a body of water to rise, and there is evidence in the record indicating that Devils Lake has risen and fallen in the past. Riparian landowners are by necessity subject to losses and gains caused by the water; under wellestablished principles of law a riparian landowner " 'is without remedy for his loss in this way [and] cannot be held accountable for his gain.' " ... In August 1993, the trial court in this case found that the elevation of Devils Lake at the time of

the original survey in 1883 was 1434.4 feet mean sea level, but in June 1993, the elevation of Devils Lake was more than ten feet lower, at 1424 feet mean sea level. That Devils Lake has flooded, and that this flooding may create losses and gains for adjacent landowners, is therefore neither an exceptional nor an unconscionable circumstance.

*Wakefield*, 542 N.W.2d at 728–729 (internal citations omitted). This Court concluded the flooding of Devils Lake was insufficient to relieve the appellant from the obligations and duties it had to the property owners under the judgment.

[¶ 14] As we noted in *Wakefield*, Devils Lake has a history of rising and falling. Consequently, adjudication of the Nords' action is capable of repetition, yet evading review. We conclude the fact the Devils Lake flooding has inundated the disputed property does not render this appeal moot.

### III

[¶ 15] The Herrmans and Peterson assert the trial court used an incorrect method for ascertaining the property lines under the circumstances of this case. They argue the trial court improperly disregarded the principle the meander line forms the common boundary of a tract of land and also disregarded the uncontradicted testimony of their expert witness who proffered an alternative method for ascertaining the property lines.

[¶ 16] Devils Lake is a navigable body of water, and a water line, rather than a meander line, ordinarily forms the boundary of a tract of land abutting a navigable body of water. *See Bed of Devils Lake*, 423 N.W.2d at 143. This Court held in *North Shore*, 530 N.W.2d at 302–303, a deed that designates a meander line as a boundary conveys the grantor's interest in the property to the ordinary high watermark, and correlative interests, vis-a-vis the State, between the ordinary high watermark and ordinary low watermark, except when the record title establishes a prior conveyance or separation of the upland and riparian land, or a grant explicitly indicates a different intent by an explicit reservation or exception. The *North*

*Shore* decision attempted to preserve a degree of certainty for conveyances of interests in land defined by a meander line along a lakeside boundary.

[¶ 17] Here, the Nords' deeds and the plat of the Old Townsite Estates subdivision refer to the meander line of Devils Lake, without any explicit reservations or exceptions. Those deeds conveyed the parties' property below the meander line, or, as the trial court correctly observed, "the water line when it is below the meander line becomes the land boundary."

[¶ 18] In *North Shore*, this Court also addressed the problem of apportionment of new property lines, and held, consistent with our prior caselaw on apportionment of accretions,[5] the new shoreline must be allocated in proportion to each owner's share of the original shoreline:

"The fundamental theory underlying the ownership of accretions is that each of the several riparian owners shall have a frontage on the new shore proportionate to his frontage on the old one, connecting their respective points by straight lines. A common principle which pervades all modes of division is that no regard is paid to the direction of the side lines between contiguous owners, but the reference is solely to the shore line . . . .

"The main objects to be kept in view in any division of accretions is that the division shall be equitable and that it shall be proportional so as to give each shore owner a fair share of the land to be divided and his due portion of the new shore line proportionate to his share on the original line of the water."

*North Shore*, 530 N.W.2d at 303 (quoting *Gardner v. Green*, 67 N.D. 268, 271 N.W. 775, 783 (1937)). *See also Jennings v. Shipp*, 115 N.W.2d 12 (N.D.1962). Under the apportionment method approved in *North Shore*, a section line was extended from the meander line to the 1883 shoreline to establish the parties' proportional interests. That method happened to yield a fair result in *North Shore* because the property lines in that case diverged as they approached the shoreline.

[¶ 19] Here, the trial court used an apportionment method only superficially consistent with the specific method approved in *North Shore*. The court extended the quarter section line between the Nords' property and the Herrmans' property in Lot 7 of Old Townsite Estates straight west to the 1883 shoreline at the ordinary high water mark of 1426 feet. In this case, however, the lateral property lines converge, rather than diverge, as they approach the shore.

[¶ 20] The Herrmans and Peterson assert the method used by the trial court, although superficially consistent with the method approved in *North Shore*, results in an inequitable apportionment. Relying on the testimony of their expert witness, David Hovendick, a registered land surveyor, they assert applying the *North Shore* method in this situation results in not everyone receiving an equitable apportionment of access to the lake. Hovendick testified the *North Shore* method of apportioning the land below the meander line worked in the area at issue in that case, but it does not work in the East Bay area of Devils Lake because some owners are completely cut off from any lake access. Hovendick testified the Herrmans, Peterson and all others owning an interest in Block 2 of Old Townsite Estates are cut off from any access to the lake.

[¶ 21] Hovendick proposed using the "colonial" or "tide water" method, under which all parties would receive a proportional share of the property below the meander line. Hovendick explained, under the colonial method, a measurement is taken at the meander line and another is taken at the water's edge, with the differences between the two apportioned "so everybody gets a proportionate amount as to what lays in the field."

[¶ 22] The Nords assert the trial court did not err in rejecting Hovendick's method of apportionment and using the *North Shore* method because as the level of Devils Lake rises and falls, the actual amount of distance

---

**5.** Accretion is the gradual deposit and addition of soil along the bank of a waterbody caused by the gradual shift of the waterbody away from the accreting bank. *See J.P. Furlong Enterprises, Inc. v. Sun Exploration and Production Co.*, 423 N.W.2d 130, 133 n. 4 (N.D.1988).

at the water's edge will vary and the property lines will change. Given the instability of Devils Lake, the Nords argue Hovendick's proposed method would necessitate a redrafting of boundaries every time the water level changes and would conflict with *North Shore's* attempt to preserve some degree of certainty in conveyances.

[¶ 23] The Nords correctly argue the trial court was not required to accept the undisputed testimony of an expert witness. *See, e.g., Gardebring v. Rizzo,* 269 N.W.2d 104, 109 (N.D.1978). *See also Borsellino v. Kole,* 168 Wis.2d 611, 484 N.W.2d 564, 566 n. 1 (Ct.App.1992) (trial court did not abuse its discretion in using extended lot line method rather than colonial or right angle method under circumstances where all riparian owners would receive their due proportion of lake shore access). While the trial court may disregard an expert's testimony on equitable apportionment of accretions, *see North Shore,* 530 N.W.2d at 304, it cannot disregard the law. *North Shore* and *Gardner* require allocation of the new shoreline in proportion to each owner's share of the original shoreline. The method of extending section lines and government lot survey lines approved in *North Shore* adequately met the legal requirement of proportional allocation. But to simply use the *North Shore* method to extend a quarter section line in a manner that deprives landowners of a proportional allocation in the new shoreline is not consistent with the *North Shore* and *Gardner* requirement of proportional allocation.

[¶ 24] What may have prompted the trial court's use of the *North Shore* method in this case is the difficulty of applying the proportional allocation requirement to only three of many property owners around Devils Lake. Once a court begins adjusting property lines around a receding lake to create shares in a new shoreline proportional to the shares in the old shoreline, it is difficult to simply stop the process and limit the adjustment to a small portion of the lake shore. For example, if proportional adjustment among the parties in this case requires the Nords' north property line to be extended to the lake in a southwesterly direction, rather than straight west as done by the trial court, the Nords'

south property line may also have to be extended in a southwesterly direction in order to give the Nords proportional allocation. This would undoubtedly affect the property interests of Nords' neighbors to the immediate south, thus possibly making that neighbor an indispensable party under N.D.R.Civ.P. 19. Conceivably, under the proportional allocation requirement, a proper determination of the dispute between these three parties may require joinder of most, if not all owners around the lake.

[¶ 25] We do not hold the trial court was required to use Hovendick's proposed colonial method for proportional allocation in this case, even though it appears to more closely achieve the proportional allocation of the shoreline requirement than does the method used by the trial court. We only hold the method used by the trial court here, which has deprived some owners of any proportional allocation of the shoreline, was erroneous as a matter of law. We remand for further proceedings to achieve proportional allocation of the new shoreline. Because the $2,500 damage award was based on this improper proportional allocation, the award must be reversed.

IV

[¶ 26] The Herrmans and Peterson assert the trial court erred in awarding $500 in attorney fees to the Nords. We agree.

[¶ 27] In the absence of any contractual or statutory liability, attorney fees incurred by a plaintiff in litigation are not recoverable as an item of damages. *See Farmers Union Oil Co. v. Maixner,* 376 N.W.2d 43, 48 (N.D.1985). Attorney fees are not recoverable in an action unless expressly authorized by statute. *See State Bank of Burleigh County v. City of Bismarck,* 316 N.W.2d 85, 93 (N.D.1982). The Nords have cited no statutory or contractual authority to support this award, and we have found none. We therefore reverse the award of $500 in attorney fees to the Nords.

[¶ 28] The judgment is reversed and the case is remanded for further proceedings.

[¶ 29] VANDE WALLE, C.J., and
MESCHKE, SANDSTROM, and
NEUMANN, JJ., concur.

APPENDIX "A"